IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MICHAEL PAPPAN and MONICA MEYER, | ) | |
|   Beneficiaries and Heirs of LILLIAN PAPPAN, | ) | |
|   Deceased, | ) | |
| | ) | |
|              Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-05-694-T |
| | ) | |
| ZURICH AMERICAN INSURANCE | ) | |
|   COMPANY, a foreign insurance corporation, | ) | |
| | ) | |
|             Defendant. | ) | |

MEMORANDUM OPINION

Plaintiffs brought this action to recover benefits pursuant to a group accident policy (the "Policy") issued by defendant and providing coverage to the employees of Conoco-Phillips. The decedent, Lillian Pappan ("Ms. Pappan") was an employee covered by the Policy at the time of her death, and plaintiffs are her children and beneficiaries of the Policy. Following Ms. Pappan's death, plaintiffs filed a claim for accidental death benefits under the Policy, and that claim was denied. Plaintiffs then unsuccessfully pursued their administrative review rights and, subsequently, filed this lawsuit seeking accidental death benefits under the Policy.

The parties agree that the Policy constitutes an employee benefit plan as defined by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et. seq., as amended (ERISA"), and that plaintiffs' claims are thus governed by ERISA. Pursuant to the agreement of the parties, this action is submitted to the court for a decision on the briefs and the administrative record submitted by the parties.

Plaintiffs contend that Ms. Pappan's death is covered by the Policy because it was the result of an automobile accident. Although the evidence in the administrative record reflects that the cause of death was a ruptured left middle cerebral artery aneurysm associated with a motor vehicle accident, plaintiffs contend that the evidence shows that Ms. Pappan's ruptured aneurysm was caused by head trauma resulting from the accident. Defendant contends that denial of coverage was proper because the evidence shows that, although she was involved in an automobile accident, Ms. Pappan's death was caused by the ruptured cerebral artery aneurysm and that atherosclerotic cardiovascular disease and hypertensive cardiovascular disease were contributory to her death. Thus, defendant contends, any bodily injury sustained was not independent of all other causes, and coverage is excluded under those circumstances.

Standard of Review:

According to the well-established rules governing the review of a decision under an ERISA plan, a *de novo* standard of review applies to the plan administrator's decision unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the benefit plan. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Kimber v. Thiokol Corp., 196 F.3d 1092, 1097 (10th Cir. 1999). If such discretionary authority is granted by the plan, the court must apply an arbitrary and capricious standard of review. Rekstad v. U.S. Bancorp, 451 F.3d 1114,1119 -1120 (10th Cir. 2006); Pitman v. Blue Cross and Blue Shield of Oklahoma, 217 F.3d 1291, 1295 (10th Cir. 2000); Kimber, 196 F.3d at 1097.

In this case, the parties agree that the plan confers the requisite discretionary authority[1] and

---

[1]*Plaintiffs assert that they question whether it is proper to grant an ERISA plan administrator the discretionary authority to decide questions of plan administration because they believe that such discretion conflicts with state law. However, plaintiffs offer no authority or persuasive argument that would warrant this court's departure from the well-established authority holding that ERISA permits a plan administrator to have such discretion. See, e.g., Firestone Tire*

that the arbitrary and capricious standard of review thus applies.  However, the parties also agree that the plan administrator and insurer are the same.  In such cases,  the plan administrator operates under an inherent conflict of interest. <u>DeGrado v. Jefferson Pilot Financial Ins. Co.</u>,  451 F.3d 1161, 1167 -1168  (10th Cir. 2006), *citing*  <u>Welch v. Unum Life Ins. Co. of Am.</u>, 382 F.3d 1078, 1087 (10th Cir.2004).   More specifically, because it is both the insurer and plan administrator, may  "may favor, consciously or unconsciously, its interests over the interests of the plan beneficiaries." *Id., citing*  <u>Fought v. UNUM Life Ins. Co. of Am.</u>, 379 F.3d 997, 1003 (10th  Cir.2004).

That a conflict of interest exists does not, however, require the court to conduct a *de novo* review of the record.  On the contrary, the court must still apply the arbitrary and capricious standard of review; however, the court must utilize a "sliding scale" in which the degree of deference afforded the trustees' decision is reduced according to the severity of the conflict.  *See, e.g.*, <u>Allison v. Unum Life Ins. Co. Of America</u>, 381 F.3d 1015, 1021 (10th Cir. 2004).   Where, as here, there is an inherent conflict of interest,  "the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." <u>DeGrado</u>, 451 F.3d at 1168, *quoting* <u>Fought</u>, 379 F.3d at 1006. "[w]hen the plan administrator operates under ⋯ an inherent conflict of interest, ⋯⋯ the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard." <u>Allison</u>, 381 F.3d at 1022,  *citing* <u>Fought</u>, 379 F.3d  at 1006. The court is  obligated to "take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the

---

*and Rubber Co. v. Bruch  489 U.S. 101, 115 (1989) and numerous subsequent decisions including, most recently, this circuit's decisions in <u>Rekstad</u> and <u>DeGrado v. Jefferson Pilot Financial Ins. Co.</u>, 451 F.3d 1161 (10th Cir. 2006). Therefore, the court will not address this argument.*

particular case, untainted by the conflict of interest." *Id.; see also* <u>DeGrado</u>, 451 F.3d at 1168.

For this purpose, substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker." <u>Rekstad</u>, 451 F.3d at 1119-20; <u>Caldwell v. Life Ins. Co. of N. Am.</u>, 287 F.3d 1276, 1282 (10th Cir. 2002). It requires "more than a scintilla but less than a preponderance." <u>Rekstad</u>, 451 F.3d at 1120, *citing* <u>Sandoval v. Aetna Life and Casualty Insurance Company</u>, 967 F.2d 377, 382 (10th Cir. 1992).

The court may consider only the evidence in the administrative record: "In reviewing a plan administrator's decision under the arbitrary and capricious standard, we are limited to the administrative record-the materials compiled by the administrator in the course of making [its] decision." <u>DeGrado</u>, 451 F.3d at 1169, *citing* <u>Allison v. UNUM Life Ins. Co. of America</u>, 381 F.3d 1015, 1021 (10th Cir. 2004) and <u>Sandoval</u>, 967 F.2d at 380. In determining whether the evidence in support of the administrator's decision is substantial, the court must also "take into account whatever in the record fairly detracts from its weight." <u>Rekstad</u>, 451 F.3d at 1120; <u>Caldwell</u>, 287 F.3d at 1282.

Accordingly, in reviewing the evidence, the court will apply the established standard in an ERISA conflict of interest case by determining whether the defendant has satisfied its burden of showing that its "interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence," and whether decision was a "reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." <u>DeGrado</u>, 451 F.3d at 1168, *citing* <u>Fought</u>, 379 F.3d at 1006.

 Findings and Conclusions:

The parties agree that the Policy contains the following language with respect to pertinent

4

definitions applicable to this case:

> **Covered Loss** means a loss which meets the requisites of one or more Coverage or Enhanced Benefits, results from a Hazard, and for which benefits are payable under the Policy.
>
> **Injury** means a bodily injury directly caused by accidental means which is independent of all other causes, results from a Hazard, and occurs while the Covered Person is insured under this Policy.

Policy, Record at page Z-002.   The Policy also contains specific exclusions and limitations, including the express statement that "A loss shall not be a Covered Loss if it is caused by, contributed to, or resulted from: ...4. Illness, disease or infection."  *Id.,* p

age Z-004.

Plaintiffs do not contend that the foregoing language or any other portion of the Policy is ambiguous. Neither do plaintiffs contend that defendant failed to consider all evidence in the record when it denied the claim.  Instead, plaintiffs argue that defendant misinterpreted or misapplied the medical evidence, which they contend establishes that Ms. Pappan's death was caused by the accident.

In denying plaintiffs' claim, defendant  took the position that, although an accident was involved, the evidence showed Ms. Pappan's death was caused by the ruptured cerebral aneurysm, and the evidence further showed that she had the aneurysm for some time  prior to the automobile accident[2], and defendant  relied on medical opinions in  the record  that it is more likely that the aneurysm ruptured prior to the accident and that such occurrence caused Ms. Pappan to lose control of her vehicle.  Defendant concluded that the evidence showed that her death did not result from an accidental injury directly and independently of all other causes; as a result, it determined that the

---

[2]*The parties  agree that the medical evidence establishes that the cerebral aneurysm had existed for a considerable time period prior to the accident.*

loss was not covered under the Policy.

Plaintiffs contend that defendant's decision is an arbitrary and capricious interpretation of the evidence.  They argue that the evidence does not support defendant's interpretation but  that it supports the  conclusions of the two medical experts retained by plaintiffs, who opine  that the evidence in the record showed that severe head trauma sustained in the accident caused the aneurysm to rupture.

The record reflects that Ms. Pappan's accident was a January 21, 2004 single vehicle accident in which her automobile left the road and overturned.  According to the  emergency personnel on the scene, she told them that she lost control of her vehicle and was not wearing a seat belt.  Record, page Z-118.  The record includes a traffic collision report, which does not reflect these statements. Record, page Z-243.   However, plaintiffs state that a second page of that report  was omitted but that it was quoted verbatim by plaintiffs' counsel in a letter to defendant and included in the administrative record at page Z-253-260.   Plaintiffs' brief at page 4-5, note 1.  According to that portion of the report, plaintiff lost control of her vehicle, ran off the highway and rolled over twice; she crawled out of the rear window.  Inasmuch as defendant does not dispute the fact that the report contained a second page and does not dispute the accuracy of this description,  it is considered as having been included in the record.   The emergency medical personnel found her in the center median  upon their arrival at the scene.  Record, page Z-118.   Although she was communicative when they arrived, her condition rapidly deteriorated during transport to the hospital; she was intubated en route. *Id.;* Record, pages Z-119, 120.

A cerebral angiogram was performed, and it revealed a left middle cerebral artery aneurysm which caused a subarachnoid hemorrhage; the preoperative diagnosis was a "ruptured left MCA

bifurcation aneurysm." Operative Report of neurosurgeon Dr. Nazih A. Moufarrij, Record, page Z-140. A CT Scan of the brain also showed a subarchnoid hemorrhage. Record, page Z-207. Surgery was performed to clip the aneurysm, and the initial diagnosis was confirmed. Report of Dr. Moufarriz, Record at page Z-140. A second operative report was prepared by Dr. Stephen Smith, who placed a bolt to monitor intracranial pressure. Record, page Z-145. Dr. Smith's report listed the preoperative diagnosis and post-operative diagnosis as "status post motor vehicle accident with bilateral subarachnoid hemorrhage." Record, page Z-145.

Dr. Roekchai Tulyapronchote, a neurologist, was consulted following the surgery. He examined Ms. Pappan, and his post operative consultation report reflects Ms. Pappan's past medical history to include a history of hypertension and lupus, a 1999 coronary artery bypass times three, and a history of high cholesterol. Record, page Z-126. He also reports that "It was felt that patient probably has subarachnoid hemorrhage prior to the accident from her aneurysm." *Id*

Although she was reported as having tolerated the surgery well, Ms. Pappan's condition deteriorated and, on January 24, 2004, she died. The coroner's report includes the pathologic diagnoses, including a "ruptured left middle cerebral artery aneurysm associated with a motor vehicle accident," as well as a history of "coronary artery atherosclerosis, status post remote coronary artery bypass graft surgery," a "history of hypertension" and a "history of remote fractures of right tibia and fibula with non-union[3]." Record, page Z-235. The coroner's examination also states that there were "no blunt force injuries of the head and neck" on external examination, but that there were several contusions on her trunk and extremities. *Id.,* pages Z-237, 238. The coroner's

---

[3]*Plaintiffs agree that the broken ankle noted in this and other medical records occurred some time prior to the January 21, 2004 motor vehicle accident. While hospitalized following the accident, Ms. Pappan was examined by an orthopedic physician, Dr. Michelle Klaumann, who noted this prior surgery and planned to x-ray the ankle to confirm that it had not been reinjured.. Record, pages Z-129 and Z-130.*

opinion was that Ms. Pappan "died as a result of a ruptured left middle cerebral artery aneurysm associated with a motor vehicle accident.  Atherosclerotic cardiovascular disease and hypertensive cardiovascular disease were contributory to her death."  Record, page Z-238.  He listed the "manner of death" as "accident."  *Id.*   The death certificate appearing in the record lists the cause of death as "ruptured left middle cerebral artery aneurysm associated with a motor vehicle accident." Record, page Z-242.

After receipt of Ms. Pappan's medical records from the treating hospitals as well as prior medical records, defendant obtained a review of same by Dr. Hans Evers, a board certified neurologist.  The parties agree that Dr. Evers performs medical reviews on behalf of defendant, and they refer to him as an "in-house" medical expert for defendant.  Dr. Evers opined that, based on the records and his knowledge and experience with aneurysms, the "single motor vehicle rollover accident was likely caused by the spontaneous rupture of a previously asymptomatic aneurysm. Claimant's death was the result of the severe subarachnoidal hemorrhage that followed the rupture." Record, page Z-241.

On July 28, 2004, defendant notified  plaintiffs that the claim was denied because the evidence did not

> ...provide evidence that the loss was the result of an accident, direct and independent of all other causes, but that the motor vehicle accident was likely caused by the spontaneous rupture of a previously asymptomatic aneurysm, resulting in severe subarachnoid hemorrhage and death.

Record, page Z-030.  Defendant specifically identified the following items as having been examined and considered in reaching its  conclusion:

> Statement of the Attending Physician, certified copy of the Death Certificate which reported the immediate cause of death as ruptured left middle cerebral artery aneurysm associated with a motor vehicle accident, reporting contributing conditions

as atherosclerotic cardiovascular disease and hypertensive cardiovascular disease, the Oklahoma Traffic Collision report, the Sedgwick County, Kansas External Examination Report which reported the cause of death, as mentioned above, and advised that no blunt force injuries of the head and neck were identified, an obituary notice and newspapers report, medical records from Via Christi Regional Medical Center and David A. Schmeidler, MD and the result of an independent medical review provided by Hans Evers, MD, a Board Certified neurologist.

*Id.*  The court has examined the administrative record and finds that each of the referenced reports or documents is included and that the brief summaries of the records are accurate.

Defendant's July 28, 2004 letter denying the claim also advised plaintiffs of their right to seek an administrative review of that decision.  They did so and, in connection with their appeal, retained two physicians to review the record and provide  medical opinions  regarding the cause of Ms. Pappan's death.  These were submitted to defendant's appeal review committee, along with a lengthy letter from plaintiffs' counsel  affidavits  from her daughter-in-law and her daughter.   In addition to these materials, the review committee obtained the opinion of an independent medical consultant who is a  board-certified neurologist.

The reports prepared by plaintiffs' retained physicians conclude that the ruptured aneurysm was caused by trauma resulting from the motor vehicle accident.  The physicians conclude that, contrary to the opinion of Ms. Pappan's treating neurologist  Dr. Tulyapronchote and defendant's "in-house" neurologist Dr. Evers,  the evidence in the record shows that the aneurysm ruptured because of head trauma sustained in the accident.

Plaintiff's expert Dr. Bryan A. Lucenta is a board certified physician in "internal  medicine, cardiovascular disease and interventional cardiology; " his report does not indicate that he is a neurologist.   Record, page Z-249.  His February 9, 2005 opinion  reported that he had reviewed the medical records regarding Ms. Pappan and concluded that the aneurysm ruptured because of

"significant head trauma" resulting from her ejection from the vehicle, and that the rupture was "secondary to the impact itself."  Record, page Z-250.  He noted that her medical records reflected a history of coronary artery bypass surgery and hypertension.  Record, Z-249.  He also noted the absence of any medical record of symptoms prior to the accident, and stated that  symptoms such as  severe headaches or nausea  often precede a rupture.  He  further opined that the likelihood of the aneurysm "suddenly rupturing with no prodromal signs and symptoms and causing this person's motor vehicle accident and ultimate death appears to be quite remote."  *Id.*

Plaintiffs'  second expert report was prepared by Dr. David A. Traub, whose practice is described on his letterhead as "internal medicine and pain management;" there is no indication that he is board certified or that he is a neurologist.  Record, page Z-264.  Dr. Traub's report discussed his review of Ms. Pappan's medical records.  Dr. Traub agreed that all records show the cause of death to be a ruptured cerebral aneurysm; he also noted Ms. Pappan's history of coronary artery disease and hypertension as well as bypass surgery.  Record, page Z-264.  He disagreed with the opinion of  Dr. Evers that the aneurysm most likely ruptured prior to the accident and caused Ms. Pappan to lose control of her vehicle, as well as the opinion of Dr. Tulyapronchote that the aneurysm probably ruptured prior to the accident.  *Id.*  Instead, Dr. Traub opined that a "closed head injury" caused by the automobile accident led to the rupture of the aneurysm.  Record, page Z-265.  He referred to "blunt trauma" and "shearing" caused by trauma to the head, which he believed caused the aneurysm to rupture.  *Id.*

In support of their appeal, plaintiffs also submitted the affidavit of Ms. Pappan's daughter-in-law, Jeanie Pappan, and her daughter, plaintiff Monica Meyer.  Jeannie Pappan states that she spoke with her mother-in-law the night before the accident and that Ms. Pappan did not complain of a

headache; she had worked a full day and then cleaned her house.  Record, page Z-266.  She also

states that she had seen Ms. Pappan two days before the accident.  *Id.*  Plaintiff Monica Meyer states

that she saw her mother the evening prior to the collision and that her mother had worked a full day

and cleaned her house; Ms. Meyer states that Ms Pappan did not have a problem with headaches

prior to the collision[4]. Record, page Z-267.

In addition to the foregoing, the review committee obtained an independent medical review

of the evidence by a board-certified neurologist, Dr. J. Edmonds McDaniel.  Record, pages 246-A

through 246-D.  Dr. McDaniel was  asked to provide a medical opinion as to "whether the loss was

a result of an accident directly or independent causes or whether the claimant's ruptured left middle

cerebral artery aneurysms and underlying conditions, atherosclerotic cardiovascular disease, and

hypertensive cardiovascular disease caused the motor vehicle accident and subsequent death."

Record, page Z-246-D.  In his subsequent report, Dr. McDaniel identified  44 documents or sets of

documents which he had examined in connection with his review; these consist of the material in

the administrative record, including all medical records, as well as the autopsy report.  Record, page

Z-246-A through 246-C.  He concluded that:

> The motor vehicle accident in and of itself could not cause an aneurysm although a
> sudden jump in blood pressure associated with motor vehicle accident may have
> precipitated the rupture of the aneurysm.  The aneurysm, however, would have
> already been present prior to the accident.  This is reportedly a one-vehicle accident.
> A more likely scenario is that the aneurysm ruptured and, associated with that, the
> patient had her accident.

---

[4]*As plaintiffs argue, there are also no medical records reflecting complaints of headaches by Ms. Pappan prior to the accident. However, the court notes that her medical records in the administrative record include a January 14, 2004 entry by her regular physician, Dr. David A. Schmeidler, who examined her on that date, approximately one week prior to the motor vehicle accident.  Record, page Z-052.  That report reflects that she had been hospitalized for acute pancreatitis; according to the record, she told Dr. Schmeidler on January 14, 2004, that she "feels yucky and ill, tired and fatigued.  Went back to work and she is having difficulty working due to the fatigue."  Id. The record also reflects that, during Ms. Pappan's hospitalization after the January 21 accident,  Ms. Pappan's family told Dr. Tulyapronchote, the treating neurologist, that Ms. Pappan had been tired prior to the date of the accident. Record, page Z-127.*

11

*Id.,* page Z-346-D.

The court has examined the record to determine whether it contains evidence which was not considered by the review committee  which would have supported plaintiffs' claim.  The court concludes that defendant considered the record as a whole in its initial decision.  Further, the appeal review committee also considered that record in addition to the new material, including the two medical opinions, submitted by plaintiffs; it also considered the report of the independent neurologist.   The court concludes that there is no evidence that defendant failed to consider or review any material in the record.

Defendant's  review committee notified plaintiffs of its decision by letter of April 28, 2005. Record, page Z-245.  It explained that, in addition to the previous documents in the record, it had reviewed the opinions of Dr. Traub and Dr. Lucenta, as well as the opinion of Dr. Hans Evers and that of the independent neurologist.   The committee quoted from the above opinion of the independent neurologist, Dr. McDaniel, and advised plaintiffs that it had  determined that the evidence showed that the aneurysm "caused, contributed to, or resulted in the single motor vehicle accident dated January 21, 2004."  Record , page Z-246.  It further concluded that the bodily injury sustained by Ms. Pappan was "not independent of all other causes."  *Id.*    Thus, it determined that the loss was not covered under the terms of the Policy.

Plaintiffs now contend that the evidence supports their physicians' conclusions that the rupture to the aneurysm was caused by head trauma resulting from the motor vehicle collision and that the medical opinions to the contrary are not supported by the evidence.

 As noted above, most of the medical documents describe the fact that Ms. Pappan suffered a   ruptured cerebral aneurysm and that she had been in a motor vehicle accident.    The records

reflecting her hospital treatment and her previous medical records also refer to her history of cardiovascular disease and the fact that she had undergone coronary bypass surgery.  All medical opinions, including those submitted by plaintiffs, agree that Ms. Pappan had the aneurysm for some time prior to the accident and all agree that the aneurysm ruptured.  Although the hospital records and related medical records as well as the death certificate state that she had a ruptured aneurysm "associated with" a motor vehicle accident, these records do not contain an opinion that the rupture was "caused by" the motor vehicle accident. In fact, the treating neurologist, Dr. Tulyapronchote, noted his belief that the rupture likely occurred prior to the accident, as he stated that  Ms. Pappan "probably had a subarachnoid hemorrhage prior to the accident from the aneurysm."  Record at page Z-126.

In fact, the only  medical record that  expressly  references  the "cause" of Ms. Pappan's death is  the medical examiner's autopsy report, which states that, in the examiner's opinion, Ms. Pappan "died as a result of a ruptured left middle cerebral artery aneurysm associated with a motor vehicle accident.  Atherosclerotic cardiovascular disease and hypertensive cardiovascular disease were contributory to her death."  Record, page Z-238.

The court notes that plaintiffs' two medical opinions do not address the autopsy report conclusion regarding the cause of death.  However, both Dr. Lucenta and Dr. Traub concluded that the rupture to the aneurysm and resulting death was "caused by" the accident, stressing their conclusions that the rupture was caused by "significant head trauma" (Dr. Lucenta) and "blunt trauma" to the head (Dr. Traub) resulting from the collision.  However,  the autopsy report does not mention severe head trauma or injury to the head resulting from the motor vehicle accident.  On the contrary,  the autopsy report expressly reports that the medical examiner found "No blunt force

injuries of the head and neck."  Record, page Z-237.

The court has found no medical evidence of any treating physician concluding that  the rupture was "caused" by head trauma resulting from the motor vehicle accident, independent of any other cause or condition. While the traffic report in the record describes the accident as a "fatality accident," that report is not a medical opinion; similarly, the article appearing in the local newspaper which described the death as resulting from a traffic accident contains no reference to a supporting medical opinion.  Although the record contains references to the motor vehicle accident and, in some cases, refers to a ruptured aneurysm "associated with" a motor vehicle accident, those references do not state that the ruptured aneurysm was caused by blunt head trauma.     While it is true that the hospital examination report notes an abrasion to the forehead and some evidence of ecchymosis, or hemorrhage, in the area of  one eye, the court has not located a finding of severe head trauma in the medical records.

Reviewing the evidence in detail, the court  has taken into account defendant's  conflict of interest   and has afforded less deference to defendant's decision because of that conflict. In particular, the opinion of the "in house" expert neurologist, Dr. Evers, is afforded diminished  weight than would otherwise be appropriate because of his employment with defendant.  If that report is excluded because of the conflict of interest, however, the record establishes that two independent neurologists, Dr. Tulypronchote and Dr. McDaniel,   reached  the conclusion that the aneurysm likely ruptured prior to the accident.   In addition,  the court finds the record lacking in evidence supporting plaintiffs' physicians' reliance on a blunt head injury or severe head trauma, particularly in light of the autopsy report negating the existence of head trauma.

Further considering the evidence in light of the defendant's conflict of interest, the court has

reviewed the initial decision and review committee decision and noted the items in the record considered by each in reaching their respective conclusions.  Although the initial denial relied at least in part on the opinion of Dr. Evers, it also cited the opinion of the treating neurologist, Dr. Tulypronchote.  The initial decision also delineates the other evidence considered, and the court does not find any omitted evidence of record.   The review committee considered the same evidence, but also considered the opinions of plaintiffs' two medical experts and that of the independent neurologist.  Again, the court finds no evidence that the committee omitted any evidence of record from its consideration or based its decision only on the opinion of Dr. Evers.

In any event, the court notes, the denial of benefits was not based only on the determination that the aneurysm ruptured prior to the accident.  As the review committee noted, the record reflects that Ms. Pappan's death was caused by a ruptured cerebral artery aneurysm; however, the evidence also notes that cardiovascular disease and hypertensive cardiovascular disease were "contributory to her death."  Medical Examiner's autopsy report, Record at page Z-238.  As the review committee noted, the policy excludes losses which are "caused by, contributed to, or resulted from...illness, disease or infection."  Review Committee April 28, 2005 letter, Record at page Z-245; Policy at page 2, Record, page Z-002.  The committee also found that the evidence showed that the injury sustained by Ms. Pappan was not "independent of all other causes," as required by the terms of the Policy.  Policy, page 2, Record at page Z-002.  That conclusion is supported by the record; in particular, the autopsy report discussing the cause of death and contributory factors, supports that determination.

The court concludes that, when given less deference because of the conflict of interest, the defendant's decision nevertheless is supported by substantial evidence in the record.  Even if the "in

house" neurologist's opinion is not considered, the medical evidence supports the determination that the loss is not covered under the Policy because other causes or diseases contributed to her death. As required by this circuit, defendant has satisfied its burden of proving " the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard," as it has "demonstrated that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." <u>Allison</u>, 381 F.3d at 1022; <u>Fought</u>, 379 F.3d at 1006; *see also* <u>DeGrado</u>, 451 F.3d at 1168.   Furthermore, even if plaintiffs are correct in their argument that defendant bears the burden of showing the application of the exclusion by a preponderance of the evidence[5], the court concludes that defendant has met that burden.  The preponderance of the evidence in the record before the court shows that Ms. Pappan's death was caused by a ruptured cerebral aneurysm and that atherosclerotic cardiovascular disease and hypertensive cardiovascular disease contributed to her death and, as a result, the loss was excluded under the terms of the policy.

Accordingly, the court finds that plaintiffs are not entitled to recover on their claim. Judgment shall enter in favor of defendant and against plaintiffs on their claim for ERISA benefits under the defendant's accidental death policy.

IT IS SO ORDERED this   14th day of August, 2006.

---

[5]*Plaintiffs argue that the court must apply the arbitrary and capricious standard of review.  Plaintiffs' brief, pages 16-18. However, they include extensive argument that certain state court decisional law is not preempted by ERISA, and urge the court to require defendant to prove the application of the Policy exclusion by a preponderance of the evidence.  Although both plaintiffs and defendant include a discussion of state law "saved" from ERISA preemption, the court does not find that argument dispositive of this case. Although the Tenth Circuit and other courts have held that ERISA does not preempt some state statutes and decisional case law,  plaintiffs have not offered any authority holding that the well-established ERISA rules regarding the scope and standard of review have been "saved" from ERISA preemption. In any event, as noted, the court concludes that defendant has established by a preponderance of the evidence that the Policy exclusions apply to these facts.*

RALPH G. THOMPSON
UNITED STATES DISTRICT JUDGE